**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMPLA, LLC | ) | |
| 1239 Broadway #1605 | ) | CASE NO. _____ |
| New York, NY 10001, | ) | |
| | ) | JUDGE _____ |
|         PLAINTIFF, | ) | |
| | ) | |
|    vs. | ) | **COMPLAINT** |
| | ) | |
| BURKE DECOR, LLC | ) | |
| c/o Jerry M. Bryan | ) | |
| Statutory Agent | ) | |
| 6 Federal Plaza Central, Suite 1300 | ) | |
| Youngstown, OH 44503, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ERIN BURKE | ) | |
| 6813 Commerce Dr. | ) | |
| Hubbard, OH 44425-2945, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AU MARCHE, LLC | ) | |
| c/o Erin Burke | ) | |
| Statutory Agent | ) | |
| 6813 Commerce Drive | ) | |
| Hubbard, OH 44425, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FURNISHINGS LA, LLC | ) | |
| c/o Christopher J. Newman, Esq. | ) | |
| Statutory Agent | ) | |
| 6 Federal Plaza Central, Suite 1300 | ) | |
| Youngstown, OH 44503, | ) | |
| | ) | |
| and | ) | |
| | ) | |

1

| U.S. SMALL BUSINESS | ) |
|---|---|
| ADMINISTRATION | ) |
| 2 North 20th Street, Suite 320 | ) |
| Birmingham, AL 35203, | ) |
| | ) |
| DEFENDANTS. | ) |

## COMPLAINT

Plaintiff Ampla, LLC ("Ampla") for its Complaint against Defendants Burke Decor, LLC ("Burke Decor"), its principal and personal guarantor Ms. Erin Burke, Au Marche, LLC ("Au Marche"), Furnishings LA, LLC ("Furnishings," and collectively with Au Marche, the "Corporate Guarantors"), and U.S. Small Business Administration states as follows:

## INTRODUCTION

1.      In this lawsuit, Ampla seeks contractual and other remedies related to Burke Decor's breach of a Growth Line of Credit Agreement dated September 27, 2022 (the "Credit Agreement"), as accelerated and amended by a Forbearance and Corporate Guaranty Agreement dated October 19, 2023 (the "Forbearance Agreement," and together with the Credit Agreement, the "Growth LOC"), as well as fraudulent misrepresentations made in relation to the Growth LOC.[1]

2.      Under the Growth LOC, Ampla agreed to loan Burke Decor up to an initial credit limit of $8,217,028 for certain limited uses, in exchange for a right to collect a percentage of Burke Decor's receivables, a security interest in substantially all of Burke Decor's assets, a right to receive accurate financial reporting, and other contractual rights and remedies including the right to receivership.  Burke Decor defaulted under the Credit Agreement by, among other

---

[1] As set forth herein, Burke Decor defaulted under both the initial Credit Agreement and also defaulted under the Forbearance Agreement, all in breach of the Growth LOC comprised of the Credit Agreement and the Forbearance Agreement.  Ampla is entitled to all available remedies under the entirety of the Growth LOC.

things, transferring funds to unauthorized entities, using funds for unauthorized purposes, and failing to report and deposit revenue, thus reducing Ampla's recovery of the percentage of receivables due to it. Ampla worked out the Forbearance Agreement with Burke Decor, in which Burke Decor and its guarantors admitted that Ampla was owed an accelerated balance of $7,469,495 as of October 19, 2023. Burke Decor defaulted under the terms of the Forbearance Agreement as well. Burke Decor currently owes Ampla in excess of $6.4 million, plus interest accruing at the contractual rate.

3. Additionally, Burke Decor and Erin Burke intentionally made material, written, false representations about Burke Decor's financial condition during the life of the Growth LOC. Ampla reasonably relied upon these misrepresentations to its detriment when it loaned additional funds to Burke Decor that it would not have loaned if Burke Decor's true financial condition had been disclosed and/or did not to pursue remedies available to it under the Growth LOC based on Burke Decor's multiple breaches of contract. Burke Decor and Erin Burke caused the misrepresentations to be made with intent to deceive.

4. Ms. Erin Burke, the principal of Burke Decor, made a limited personal guaranty for Burke Decor's payment obligations under the Growth LOC and is personally liable for the full balance owed to Ampla, because the terms of her personal guaranty have been triggered. Furnishings and Au Marche, the Corporate Guarantors, unconditionally guaranteed Burke Decor's payment obligations under the Growth LOC and are also liable for the full balance owed to Ampla.

5. Burke Decor granted receivership rights to Ampla under the Growth LOC, which have been triggered by these defaults and fraudulent conduct. Erin Burke and Burke Decor's unauthorized uses of funds, depletion of corporate assets, and inaccurate financial reporting all

entitle Ampla to a receiver to preserve and/or sell the collateral securing the Growth LOC (*i.e.*, Burke Decor's assets).

## THE PARTIES

6. Plaintiff Ampla is a New York limited liability company, operating as a private lender entity serving the e-commerce and consumer brands industry. Its sole member is Ampla Technologies, Inc., a Delaware corporation with its principal place of business in New York City.

7. Defendant Burke Decor is an Ohio limited liability corporation. Upon information and belief, its principal place of business located in Boardman, Mahoning County, Ohio. Its sole member is Erin Burke. Burke Decor is in the business of marketing and selling high-end furniture and fixtures, chiefly online at www.burkedecor.com and at retail locations including one in Boardman, Ohio.

8. Defendant Erin Burke ("Ms. Burke") is, upon information and belief, a resident of Ohio. Ms. Burke maintains an Ohio driver's license (expiring August 2024) registered to a commercial building located at 6813 Commerce Dr., Hubbard, Ohio 44425-2945. Ms. Burke is the President and sole member of Burke Decor, and is a limited personal guarantor of Burke Decor's payment obligations under the Growth LOC.

9. Defendant Au Marche is an Ohio limited liability company. Upon information and belief, its sole member is Ms. Burke or Burke Decor. It is a secured corporate guarantor of Burke Decor's payment obligations under the Growth LOC.

10. Defendant Furnishings is an Ohio limited liability company. Upon information and belief, its sole member is Ms. Burke or Burke Decor. It is a secured corporate guarantor of Burke Decor's payment obligations under the Growth LOC.

11.     The U.S. Small Business Administration (the "SBA") may have an interest in the collateral that is the subject of this action pursuant to Financing Statement Nos. OH00262056346 and OH00239630476.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332.  The parties are of diverse citizenship and the amount in controversy exceeds $75,000. Ampla's sole member is incorporated in Delaware and located in the State of New York.  Burke Decor, Ms. Burke, Au Marche, and Furnishings are not citizens of the States of New York or Delaware.  This is an action based on, among other things, a breach of the Growth LOC involving damages exceeding $6.3 million and fraudulent misrepresentations made in relation to the Growth LOC.

13.     Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because: a substantial part of the events underlying Plaintiff Ampla's claims occurred within Mahoning County, Ohio; the Collateral (defined below) is located or controlled within Mahoning County, Ohio; and Defendant Burke Decor's principal place of business is in Mahoning County, Ohio. Moreover, as Ohio limited liability companies, Burke Decor, Au Marche, and Furnishings are all subject to service in the State of Ohio.  Mahoning County is located in the territorial jurisdiction of the Eastern Division of the Northern District of Ohio.

## FACTS

14.     Ampla is a private lender for the e-commerce and consumer packaged goods industry.  Ampla operates an all-in-one platform offering consolidated financial products to provide consumer-facing companies modern solutions to fuel growth and enhance efficiency. Chief among Ampla's operating principles is a dedication to working tirelessly to ensure customer satisfaction, earning trust through honesty, and pushing toward future growth through data-driven innovation and decision making.  One of the distinctive features of Ampla's business model, for instance, is its willingness to be flexible in its repayment arrangements with its clients.  Rather than requiring fixed repayment amounts, Ampla works with its clients to fashion fluid repayment structures, which enable their clients to succeed in their business enterprises. Since its inception in 2022, Ampla has raised more than $600 million in capital.  Ampla has received extensive praise from both its customers and within the financial services sector, being hailed for its "commitment to innovation and its track record [for] effectively serving consumer brands."[2]

15.     Defendant Burke Decor was formed by Erin Burke, its CEO and sole owner and member.  Burke Decor is engaged in the business of marketing and selling high-end furniture and home furnishings online. It has characterized itself as an online provider of "quality, high style design [of furniture] to people outside of metropolitan areas."[3]  Its annual sales in recent years exceeded $85 million.

---

[2] *City and Waterfall Asset Management Provide $275MM Credit Facility to Ampla*, ABF JOURNAL (Dec. 20, 2023), *available at* https://www.abfjournal.com/dailynews/citi-and-waterfall-asset-management-provide-275mm-credit-facility-to-ampla/ (last visited Mar. 22, 2024).

[3] *About Us*, BurkeDecor.com, *available at* https://www.burkedecor.com/pages/about-us (last visited Mar. 22, 2024).

**Growth Line of Credit Agreement**

16.     In September 2022, Erin Burke on behalf of Burke Decor connected with Ampla regarding funding to support Burke Decor's online furniture business.

17.     At the time Ms. Burke connected with Ampla, Burke Decor had already taken a loan through the SBA in the approximate amount of $1 million (with approximately $500,000 advanced at the time the Growth LOC was underwritten).

18.     In seeking funding from Ampla, Erin Burke and Burke Decor made representations regarding Burke Decor's business, financial circumstances (including the extent of Burke Decor's sales), the value of its inventory, and other essential information.

19.     On or about September 27, 2022, reasonably relying on the information Ms. Burke and Burke Decor provided, Ampla entered into the Credit Agreement with Burke Decor. A copy of the Credit Agreement is attached as Exhibit 1. It provides, in relevant part, that Ampla would provide Burke Decor with an initial credit limit of $8,217,028, and a maximum credit line not to exceed $16 million, for the following limited uses only:

- Purchases of inventory, raw materials, packaging, or other specified goods;
- Manufacturing payments;
- Payments to shipping and/or fulfillment partners;
- Purchases of marketing and advertising services; and
- To the extent  not included above, other general administrative costs as determined by Lender [*i.e.*, Ampla] in its sole discretion.

(Credit Agreement, ¶¶6, 52).  Burke Decor agreed to these limitations and certified it would use advanced funds for these enumerated purposes only.

20.     Burke Decor would obtain advances by submitting an online Advance Request, which funds Ampla would advance by ACH credit or wire transfer to a Designated Checking

7

Account (defined in Credit Agreement ¶¶2, 7) if the request was approved. Ampla retained the right to reject an Advance Request (defined in Credit Agreement ¶¶2, 9), including upon the occurrence of an Event of Default (defined in Credit Agreement ¶32).

21. There was no fixed repayment amount due to Ampla under the Credit Agreement. Instead, in exchange for the funds advanced to Burke Decor, Ampla was entitled to collect a percentage of Burke Decor's receivables to be determined based on the percentage of available credit Burke Decor used: (A) for 0-20% credit utilization, Ampla was entitled to 8% of Burke Decor's receivables; (B) for 21-40% credit utilization, Ampla was entitled to 16% of Burke Decor's receivables; (C) for 41-60% credit utilization, Ampla was entitled to 24% of Burke Decor's receivables; (D) for 61-80% credit utilization, Ampla was entitled to 32% of Burke Decor's receivables; and (E) for 81-100% credit utilization, Ampla was entitled to 40% of Burke Decor's receivables. Ampla would use these rates to determine the amount to collect from Burke Decor's receivables on a daily basis as they accrued (the "Collection Amount"). The Collection Amount would be collected via ACH debits each business day. This is how Ampla was paid.

22. To facilitate Ampla's debit of the Collection Amount and Burke Decor's Obligations (defined in Credit Agreement ¶2) as holder of the receivables for Ampla's benefit, Burke Decor was required to "cause all Receivables to be paid into [a] Designated Checking Account" in Burke Decor's name and hosted at a banking institution of Ampla's choice. Further, Burke Decor agreed to collect all receivables promptly for deposit into that account, report all receivables to Ampla, and enable Ampla to debit the Collection Amount from the Designated Checking Account. Until such time as the Collection Amount was withdrawn, Burke Decor was required to hold its receivables in trust for Ampla.

23.     Burke Decor was prohibited from diverting any receivables away from the Designated Checking Account or denying Ampla access to that account, and all receivables held by payment processers or other third-parties in a transfer account were required to be deposited in the Designated Checking Account within 14 days of their receipt (subject to such processor's or other third-party's account-transfer rules).

24.     Additionally, Burke Decor was expressly prohibited from "putting a stop order or blocking any ACH or other remittance of Receivables to Borrower, or taking any action that results in a stop order or block."  (Credit Agreement, ¶23).

25.     The Credit Agreement also included a Limited Guaranty (defined in Credit Agreement, Signature Page) that Ms. Burke executed in which she agreed to be liable to Ampla "for losses and/or damages caused by [Burke Decor's] gross negligence, willful misconduct, misrepresentation or fraud."  (Credit Agreement, Signature Page).

26.     Further securing Ampla's right to payment, Burke Decor granted Ampla a security interest in the following collateral ("the Collateral"):

> (i) all Receivables including but not limited to any amounts owing to Borrower now or in the future; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

(Credit Agreement, ¶17).  Ampla recorded its security interest via a UCC Financing Statement by First Corporate Solutions, Inc., as representative, on September 28, 2022, which recording is assigned FS No. OH00267040873, and on October 4, 2023, which recording is assigned as FS No. OH00276420678 in the records of the Ohio Secretary of State.

27.     In or around June 2023, Ampla discovered that Burke Decor had diverted money to entities affiliated with Burke Decor or Erin Burke that did not meet the enumerated uses under the Credit Agreement, were not disclosed as co-borrowers, and that Ampla had not approved. Specifically, Burke Decor was providing intercompany loans to unauthorized entities, which had grown from approximately $2 million in June 2022 (time the Growth LOC was underwritten) to $2.9 million as of December 2023. Additionally, from bank statement information provided to Ampla by Erin Burke and Burke Decor, Burke Decor made unauthorized transfers of:

- approximately $300,000 to Au Marche between June 2022 - June 2023;

- approximately $200,000 to 222 N. Brand Realty, LLC between June 2022 – June 2023 (approximately $250,000 from June 2022 – present);

- approximately $180,000 to 7373 Market St, LLC between June 2022 – June 2023 (approximately $250,000 from June 2022 – present);

- approximately $130,000 to Erin Burke between June 2022 – June 2023 (approximately $156,000 from June 2022 – present); and

- approximately $175,000 to an unknown entity for "SHELLPOINT MORTGAGE" between June 2022 – June 2023 (approximately $260,000 from June 2022 – present).

These payments included payroll, taxes, and mortgage payments for unauthorized entities.

28. These transfers of funds were not authorized under the Credit Agreement, did not satisfy the limited, enumerated uses for funds advanced under the Credit Agreement, and breached the terms of it.

29. Ampla also learned that Burke Decor deposited receivables in accounts other than the Designated Checking Account. Beginning in July 2023, Burke Decor moved a majority of revenue from its payment processor, Paymentech Solutions, away from Ampla and directly into Burke Decor's own checking account. Even after Ampla pointed out this conduct to Burke Decor, the latter continued to mask or divert receivables in breach of Burke Decor's Obligations. For the period of April 1, 2023 to October 31, 2023, Burke Decor directly collected $29,200,000 in revenue. Using an average collection percentage of 40%, based on credit utilization, Burke Decor should have remitted approximately $11,650,000 to Ampla in Collection Amounts to pay down the Growth LOC. During this time period, however, Burke Decor made wire payments and permitted Collection Amounts from the Designated Checking Account together totaling only about $6,300,000. By keeping receivables out of the Designated Checking Account, Burke Decor and Ms. Burke wrongly held onto approximately $5,350,000 which was owed to Ampla as repayment.

30. Because Ampla used the receivable deposits and its access to the Designated Checking Account to determine the Collection Amount, and because Ampla debited the Collection Amount via ACH transfers from the Designated Checking Account, Burke Decor's diversion of receivables to other accounts interfered with and deprived Ampla of the ability to calculate accurately and collect all sums due, the very essence of the Growth LOC mechanics.

31. As signatories to the Credit Agreement, Erin Burke and Burke Decor knew that the masking and diversion of receivables would result in an incomplete and inaccurate

determination as to the Collection Amount and would deprive Ampla of its full contractual payment and Ampla's ability to recover that payment.

32.     When Burke Decor failed to keep up with the wire payments it was making, Ampla sought to debit Burke Decor's Chase bank account ending in 0795 to recover sums due, as Ampla had done previously.  On or about August 17, 2023, Burke Decor blocked access to its Chase bank account (an ACH debit block), in breach of the Credit Agreement.  This precluded Ampla from receiving a payment in excess of $410,000 that was requested.

33.     Because of Burke Decor's actions breaching terms of the Credit Agreement, Ampla sent Burke Decor, attention Erin Burke, a Notice of Event of Default and Opportunity to Cure ("Notice") on August 17, 2023, identifying incidents of breach. The Notice allowed Burke Decor and Ms. Burke time to cure the event.  Neither Burke Decor nor Ms. Burke did so.  A copy of the Notice is attached as Exhibit 2.

34.     These multiple violations of Burke Decor's obligations under the Credit Agreement constituted independent defaults under Paragraph 32 of the Credit Agreement.

35.     Paragraph 33 of the Credit Agreement sets forth the parties' rights and remedies upon a default. It provides, among other remedies, that Ampla may: (1) "declare any and all Obligations immediately due and payable, without notice of any kind to [Burke Decor]"; (2) assemble and sell all of the Collateral; and (3) appoint a receiver to take possession over all of the Collateral, collect Burke Decor's revenues, and administer Burke Decor's accounts.

### The Forbearance Agreement

36.     On or about October 19, 2023, Ampla and Burke Decor entered into the Forbearance Agreement.  A copy of the Forbearance Agreement is attached as Exhibit 3.

37.     The Forbearance Agreement did not waive, eliminate, or replace any of the obligations, rights, or remedies under the Credit Agreement.  It also did not cure the Events of Default under the Credit Agreement.  The Forbearance Agreement set out the terms upon which Ampla was willing to withhold enforcement of the rights and remedies under the Credit Agreement so long as Burke Decor remained in compliance with such terms. It also further secured Ampla through the addition of the two Secured Corporate Guarantors, and additional rights to enforce certain structured payments of an accelerated balance.

38.     In the Forbearance Agreement, Defendants agreed and admitted that:

> Pursuant to the Credit Agreement, Section 33(C), Lender asserts it can accelerate the balance of Obligations, which as of today's date is $7,469,495.00, plus hereinafter accruing contractual interest ("Balance").  Lender asserts that the Balance is now due and owing, in full.  Borrower admits that the Balance is now due and owing, in full, to Lender.

(Forbearance Agreement, p.1).  This provision and unequivocal admission by Burke Decor (and Erin Burke as signatory) of default constituted an acceleration of Burke Decor's payment obligations under the Credit Agreement.

39.     Defendants Au Marche and Furnishings also joined in the Forbearance Agreement as corporate guarantors of all of Burke Decor's Obligations under the Growth LOC:

> The guarantors signing below are affiliate companies of the Borrower ("Secured Corporate Guarantors"). Secured Corporate Guarantors each, joint and several to each other and the Borrower, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Credit Agreement, which as of today's date, includes but is not limited to a running Balance of Obligations of $7,469,495.00 (this "Secured Corporate Guaranty"). . . . Furthermore, and not limiting the foregoing in any respect, Secured Corporate Guarantors each consent to, agree to be bound by, and otherwise join into each and every of the following provisions from the Credit Agreement in the same capacity as, and thus alongside and joint and several to Borrower, which provisions for the avoidance of any doubt are hereby incorporated by reference: Sections 17, 18, 19, 20, 22, 23, 25, 26, 28, 29, 32, 33, 34, 35, 36, 39, 45, 46, 47, 48, 50 and 52.

(Forbearance Agreement, ¶5) (emphasis in original).

40.     The Secured Corporate Guarantors granted Ampla a security interest in "all assets, personal property" of theirs, coextensive with the scope of Collateral defined in Paragraph 17 of the Credit Agreement (the "Guarantor Collateral").

41.     The Forbearance Agreement further provided that effective immediately, Burke Decor was required to follow a detailed payment plan to reduce the amount of money Burke Decor owed Ampla:

> Commencing Thursday, October 19, 2023, and repeating every Thursday thereafter, and should a Thursday be a non-banking day, then the very next day (Friday), Borrower shall wire transfer to the Lender Wire Account (as defined below) the following payments: (i) for weeks 1 through 14 inclusive (commencing Thursday, October 19, 2023, and ending Thursday, January 18, 2024), $25,000 shall be wire transferred by Borrower to Lender each and every Thursday; (ii) for weeks 15 through 20 inclusive (commencing Thursday, January 25, 2024, and ending Thursday, February 29, 2024), $150,000 shall be wire transferred by Borrower to Lender each and every Thursday; and (iii) for weeks 21 through 25 inclusive (thus commencing Thursday, March 7, 2024, and ending Thursday, April 4, 2024), $250,000 shall be wire transferred by Borrower to Lender each and every Thursday (collectively, the "Weekly Payments").

(Forbearance Agreement, ¶1) (emphasis in original).

42.     Burke Decor was also required to make a lump-sum payment of "the greater of: (i) all of Burke Decor's cash in excess of $2,000,000, or (ii) $250,000" on January 2, 2024 (Forbearance Agreement, ¶3), along with an accounting of how the amount was determined (the "Excess Cash Bullet Payment," and together with the Weekly Payments, the "Forbearance Payments").

43.     Burke Decor made some but not all of the Weekly Payments through December 2023.  But on January 2, 2024, Burke Decor committed its first major default under the Forbearance Agreement by failing to make the Excess Cash Bullet Payment.

44.     In addition, Burke Decor failed to make the full increased (from $25,000 per week to $150,000 per week) Weekly Payments for January 25, 2024 and after. Below is a summary of Burke Decor's payments against the amounts owed under the Forbearance Agreement:

| Beginning of period | End of period | Owed, per forbearance agreement | Aggregate owed, per forbearance agreement | Ampla collections | Aggregate Ampla collections | Difference in aggregate Ampla collections vs. owed |
|---|---|---|---|---|---|---|
| 13-Oct-23 | 19-Oct-23 | $25,000.00 | $25,000.00 | $3,827.06 | $3,827.06 | ($21,172.94) |
| 20-Oct-23 | 26-Oct-23 | $25,000.00 | $50,000.00 | $39,480.02 | $43,307.08 | ($6,692.92) |
| 27-Oct-23 | 02-Nov-23 | $25,000.00 | $75,000.00 | $26,940.01 | $70,247.09 | ($4,752.91) |
| 03-Nov-23 | 09-Nov-23 | $25,000.00 | $100,000.00 | $27,542.87 | $97,789.96 | ($2,210.04) |
| 10-Nov-23 | 16-Nov-23 | $1,025,000.00 | $1,125,000.00 | $607,974.12 | $705,764.08 | ($419,235.92) |
| 17-Nov-23 | 23-Nov-23 | $25,000.00 | $1,150,000.00 | $139,093.00 | $844,857.08 | ($305,142.92) |
| 24-Nov-23 | 30-Nov-23 | $25,000.00 | $1,175,000.00 | $342,897.44 | $1,187,754.52 | $12,754.52 |
| 01-Dec-23 | 07-Dec-23 | $25,000.00 | $1,200,000.00 | $19,031.34 | $1,206,785.86 | $6,785.86 |
| 08-Dec-23 | 14-Dec-23 | $25,000.00 | $1,225,000.00 | $40,764.28 | $1,247,550.14 | $22,550.14 |
| 15-Dec-23 | 21-Dec-23 | $25,000.00 | $1,250,000.00 | $29,416.42 | $1,276,966.56 | $26,966.56 |
| 22-Dec-23 | 28-Dec-23 | $25,000.00 | $1,275,000.00 | $28,953.03 | $1,305,919.59 | $30,919.59 |
| 29-Dec-23 | 04-Jan-24 | $275,000.00 | $1,550,000.00 | $19,631.32 | $1,325,550.91 | ($224,449.09) |
| 05-Jan-24 | 11-Jan-24 | $25,000.00 | $1,575,000.00 | $30,027.43 | $1,355,578.34 | ($219,421.66) |
| 12-Jan-24 | 18-Jan-24 | $25,000.00 | $1,600,000.00 | $60,442.10 | $1,416,020.44 | ($183,979.56) |
| 19-Jan-24 | 25-Jan-24 | $150,000.00 | $1,750,000.00 | $25,457.94 | $1,441,478.38 | ($308,521.62) |
| 26-Jan-24 | 01-Feb-24 | $150,000.00 | $1,900,000.00 | $34,169.24 | $1,475,647.62 | ($424,352.38) |
| 02-Feb-24 | 08-Feb-24 | $150,000.00 | $2,050,000.00 | $12,044.36 | $1,487,691.98 | ($562,308.02) |
| 09-Feb-24 | 15-Feb-24 | $150,000.00 | $2,200,000.00 | $6,142.66 | $1,493,834.64 | ($706,165.36) |
| 16-Feb-24 | 22-Feb-24 | $150,000.00 | $2,350,000.00 | $9,318.17 | $1,503,152.81 | ($846,847.19) |
| 23-Feb-24 | 29-Feb-24 | $150,000.00 | $2,500,000.00 | $10,761.99 | $1,513,914.80 | ($986,085.20) |
| 01-Mar-24 | 07-Mar-24 | $250,000.00 | $2,750,000.00 | $8,589.37 | $1,522,504.17 | ($1,227,495.83) |
| 08-Mar-24 | 14-Mar-24 | $250,000.00 | $3,000,000.00 | $11,781.52 | $1,534,285.69 | ($1,465,714.31) |
| 15-Mar-24 | 21-Mar-24 | $250,000.00 | $3,250,000.00 | $15,314.15 | $1,549,599.84 | ($1,700,400.16) |
| 22-Mar-24 | 28-Mar-24 | $250,000.00 | $3,500,000.00 | $11,597.42 | $1,561,197.26 | ($1,938,802.74) |
| 29-Mar-24 | 04-Apr-24 | $250,000.00 | $3,750,000.00 | -- | $1,561,197.26 | ($2,188,802.74) |
| 05-Apr-24 | 11-Apr-24 | Remainder | Remainder | -- | $1,561,197.26 | Remainder + Above |

45.     Moreover, the Forbearance Agreement required Burke Decor to make payment in full of all outstanding obligations, including but not limited to the principal balance on the Growth LOC plus all interest, by April 11, 2024. This amount exceeded $6.3 million as of April 11, 2024. Ampla reminded Burke Decor of this deadline in advance. Burke Decor failed to make the April 11, 2024 payment in full. Burke Decor did not offer any justification for its failure to pay.

46.     As a result, Defendants are in default of the Forbearance Agreement. Ampla provided to Burke Decor and Ms. Burke a Notice of Default of the Forbearance Agreement, which is attached as Exhibit 4. Ampla may proceed to enforce the terms of the Growth LOC and all remedies provided thereunder.

## Other Misrepresentations and Mismanagement

47.     In addition to the foregoing breaches, concealed receivables, and other misconduct, financials Burke Decor submitted to Ampla throughout FY2023 fraudulently misrepresented in a material way Burke Decor's actual financial condition.

48.     These misrepresentations throughout 2023 became apparent in 2024.

49.     A January 15, 2024, email from Ms. Burke revealed that Burke Decor had submitted financials to Ampla that omitted approximately $1.5 million in accounts payable balances.

50.     Beginning in February 2024, Glencoe Capital (Burke Decor's accounting advisor) disclosed documents to Ampla related to the Growth LOC; these documents showed that Burke Decor's previous reporting substantially misrepresented its unfavorable financial condition.

51.     Glencoe Capital disclosed a preliminary Profit & Loss statement and Balance sheet dated February 29, 2024, showing a $3.579 million write down from Burke Decor's previous inventory positions.

52.     Burke Decor's actual inventory balances were 57% *lower* than Burke Decor had been reporting to Ampla.

53.     The inaccuracy of Burke Decor's earlier inventory reporting was further highlighted by a January 4, 2024 Balance Sheet for Burke Decor submitted to Ampla by Glencoe Capital, showing that Burke Decor's inventory position, an essential metric in assessing its compliance with the Growth LOC, had not been updated in June through August 2023.

54.     Additionally, the February 29, 2024 preliminary Profit & Loss statement and Balance sheet from Glencoe Capital showed a $3.178 million *increase* to accounts payable from

previously reported positions.  Burke Decor's actual accounts payable balances were 142% higher than it had reported.

55.     Ampla was harmed by these misrepresentations because it reasonably relied on these written financial statements and continued to extend credit to Burke Decor on the basis of inaccurate financial information.

56.     Credit Agreement ¶ 8, among other relevant language, provides that Ampla "may in its sole and absolute discretion make an advance to [Burke Decor] under the Line of Credit following its receipt of an Advance Request."  Credit Agreement ¶ 10 permits Ampla to deny an Advance Request upon an Event of Default, which includes failure to faithfully provide reports and other information (Credit Agreement ¶ 33(ii)).  Credit Agreement ¶ 10 also permits Ampla to deny an Advance Request upon a breach of Burke Decor's representations and warranties, which includes the warranty that "all books and records of Borrower are accurate and up to date and will be so maintained" (Credit Agreement ¶ 22(vii)).

57.     Nonetheless, Ampla continued to loan additional funds to Burke Decor into August 2023, based upon Burke Decor's false financial records that mislead Ampla as to both Burke Decor's financial condition and compliance with reporting requirements under the Growth LOC.

58.     Moreover, Ampla was harmed by its reasonable reliance when it forwent available actions to pursue remedies available to it based on Burke Decor's contractual breaches. Ampla could have taken different actions to secure the amount owed to it had it known that Burke Decor and Ms. Burke were submitting false financial records or had it known that Burke Decor's condition was worse than represented.

## COUNT I
### Breach of Contract – Burke Decor

59.      Ampla incorporates by reference the foregoing allegations.

60.      The Growth LOC constitutes a valid and enforceable contract: the Credit Agreement and Forbearance Agreement are in writing and signed by Burke Decor through Ms. Burke in her capacity as its President and sole member, and the mutual obligations and rights arising under the Credit Agreement and Forbearance Agreement are good and valuable consideration supporting the bargain therein.

61.      Ampla performed its obligations under the Growth LOC by, among other things: (1) advancing funds pursuant to Burke Decor's Advance Requests; (2) providing Notice of Default under the Credit Agreement and Forbearance Agreement to Burke Decor, Erin Burke, Au Marche, and Furnishings; and (3) providing Burke Decor, Erin Burke, Au Marche, and Furnishings an opportunity to cure the Events of Default.

62.      As set forth herein, Burke Decor breached the Growth LOC by, among other things: (1) failing to fulfill its obligations with respect to the deposit of all receivables in the Designated Checking Account; (2) failing to accurately and fully report its receivables and other financial information to Ampla; (3) diverting receivables to accounts other than to the Designated Checking Account; (4) failing to deposit promptly all receivables into the Designated Checking Account; (5) using receivables (prior to Ampla's receipt of the related Collection Amount) and advanced funds for purposes other than those permitted under the Credit Agreement and Forbearance Agreement, including transferring funds to unauthorized entities; (6) blocking or stopping ACH transfers of payments from sales; (7) blocking or stopping ACH transfers from the Designated Checking Account to Ampla; (8) failing to make all of the Forbearance Payments; and (9) submitting false financial records to Ampla.

63. As a result of Burke Decor's multiple breaches of the Growth LOC, Ampla has been damaged in an amount in excess of $6.4 million (inclusive of principal and currently-accrued interest), plus interest continuing to accrue at the contractual rate, plus all costs and expenses incurred (the "Outstanding Balance").

64. As a result of these breaches, Ampla is entitled to, among other remedies provided in the Growth LOC: (1) compensatory damages in an amount equal to the Outstanding Balance; (2) appointment of a receiver to assemble, possess, and dispose of the Collateral, and exercise all rights and powers provided under Paragraph 33 of the Credit Agreement; (3) costs and reasonable attorneys' fees incurred in enforcing the Growth LOC (*see* Credit Agreement, ¶26); and (4) any other relief which this Court deems just and proper.

## <u>COUNT II</u>
### Breach of Limited Guaranty – Erin Burke

65. Ampla incorporates by reference the foregoing allegations.

66. In signing the Growth LOC as a Limited Guarantor of Burke Decor's Obligations, Erin Burke agreed as follows:

> The guarantor signing below is an owner or partial owner of the Borrower ("Limited Guarantor"). The Limited Guarantor understands and agrees that he or she, in his or her individual and personal capacity, shall be liable, but only liable, for losses and/or damages caused by Borrower's gross negligence, willful misconduct, misrepresentation or fraud. Such Limited Guarantor will benefit by the transactions contemplated under this Agreement, and Lender executes this Agreement based on such Limited Guarantor agreeing to this Limited Guaranty.

(Credit Agreement, Signature Page).

67. The Limited Guaranty in the Growth LOC is a valid and enforceable contract: it is in writing, signed by Ms. Burke, and supported by valuable consideration. Specifically—as stated in the Limited Guaranty—Ms. Burke personally benefited from the Growth LOC because

she was the President and sole member of Burke Decor, with an interest in its growth and financial condition.

68.     Ms. Burke and Burke Decor made written financial misrepresentations to Ampla, knowing they were substantially inaccurate, with the intention that Ampla would rely upon them. Ms. Burke and Burke Decor also concealed receivables from Ampla.  These actions constituted misrepresentations and fraud as detailed herein, triggering Erin Burke's personal guarantee under the Growth LOC.

69.     Ms. Burke and Burke Decor also engaged in willful misconduct or gross negligence, which interfered with Ampla's rights under the Growth LOC, including among other things: (1) diverting receivables to accounts other than the Designated Checking Account and otherwise concealing receivables, despite knowing that such diversion would interfere with Ampla's ability to determine and realize the Collection Amount; (2) using receivables to fund business operations rather than service debt obligations prior to Ampla's receipt of the related Collection Amount; (3) using advanced funds for purposes other than those permitted under the Credit Agreement and Forbearance Agreement; (4) failing to hold the receivables in trust for Ampla; (5) making distributions to Erin Burke—and non-authorized entities that she owns— from receivables prior to Ampla's receipt of the Collection Amount and/or from the advanced funds; (6) initiating an ACH debit block on Ampla in an intentional effort to block Ampla from collecting repayment; and (7) submitting false financial records to Ampla.  At all times, Ms. Burke and Burke Decor intended, knew, or should have known that these actions would deprive Ampla of its contractual rights and repayment.  These actions exceeded a breach of the Growth LOC terms and constituted a deliberate attempt to conceal assets from Ampla, misrepresent Burke Decor's financial condition, and deny Ampla's ability to receive sums due under the

Growth LOC structure. This willful misconduct and gross negligence also triggered Erin Burke's personal guarantee.

70. Burke Decor's and Ms. Burke's misrepresentations, willful misconduct, gross negligence, and fraud were a direct and proximate cause of the Events of Default under the Growth LOC.

71. As a result of Burke Decor's and Ms. Burke's misrepresentations, willful misconduct, gross negligence, and fraud, the Limited Guaranty is triggered and Ms. Burke is personally liable for the Outstanding Balance as provided under the Growth LOC.

72. Ampla has notified Ms. Burke of the Events of Default under the Growth LOC and demanded payment in full of all obligations due and payable to Ampla under the Limited Guaranty, which payment Ms. Burke has not made.

73. Ms. Burke's failure to make all payments due and owing to Ampla under the Limited Guaranty constitutes a breach of the Limited Guaranty.

74. As a result of Ms. Burke's breach of the Limited Guaranty, Ampla has been damaged in an amount equal to the Outstanding Balance.

75. Ampla is entitled to an award of compensatory damages against Ms. Burke in an amount equal to the Outstanding Balance. In addition to the Outstanding Balance, Ampla is entitled to an award of all costs and reasonable attorneys' fees incurred in enforcing the Growth LOC and the Limited Guaranty.

## COUNT III
### Breach of Guaranty – Au Marche and Furnishings

76. Ampla incorporates by reference the foregoing allegations.

77. The Secured Corporate Guaranty is a valid and enforceable contract: it is in writing and signed on behalf of Au Marche and Furnishings by Ms. Burke as their member.

78.     The exchange of promises in the Forbearance Agreement was good and valuable consideration for the Secured Corporate Guaranty, especially because Au Marche and Furnishings had an interest in the financial condition of Burke Decor and the contemplated forbearance as affiliated entities operating in a support capacity to Burke Decor.  Specifically, Ms. Burke had represented to Ampla that Au Marche operated as Burke Decor's payroll company for its California operations, and Furnishings was a retail store for Burke Decor's California operations.

79.     As set forth herein, Events of Default have occurred under the Growth LOC, thereby triggering Au Marche's and Furnishings' obligations under the Secured Corporate Guaranty.

80.     Ampla has demanded payment in full of all Obligations due and payable to Ampla, which payment has not been made.

81.     Au Marche's and Furnishings' failure to make all payments due and owing to Ampla under the Secured Corporate Guaranty constitutes a breach of the Secured Corporate Guaranty.

82.     As a result of Au Marche's and Furnishings' breach of the Secured Corporate Guaranty, Ampla has been damaged in an amount equal to the Outstanding Balance.

83.     Ampla is entitled to an award of compensatory damages against Au Marche and Furnishings, jointly and severally, in an amount equal to the Outstanding Balance.  In addition to the Outstanding Balance, Ampla is entitled to an award of all costs and reasonable attorneys' fees incurred in enforcing the Growth LOC and the Corporate Guaranty.

## COUNT IV
## Appointment of a Receiver

84.    Ampla incorporates by reference the foregoing allegations.

85.    The Credit Agreement provides as one of the remedies available to Ampla at any time following an Event of Default the appointment of a receiver.  The Credit Agreement provides, in relevant part, that the appointed receiver shall have the right to "to take possession of all or any part of the Collateral, with the power to protect and preserve . . . operate . . . collect the payments, rents, income, and revenues from . . . [and] apply it to payment of [Burke Decor's] Obligations.  (Credit Agreement, ¶33(F).)  Further, the receiver has the power to: (1) sell the collateral; (2) receive and open Burke Decor's mail; (3) change Burke Decor's mailing address; (4) endorse notes, checks, drafts, money orders, titles, instruments, payments, and shipments on behalf of Burke Decor; and (5) direct Burke Decor's account debtors to make payments directly to Ampla.  (Credit Agreement, ¶33(E), (G)).

86.    As set forth herein, multiple Events of Default have occurred, thereby triggering Ampla's contractual right to the appointment of a receiver.

87.    In addition to this contractual remedy, a receiver is appropriate to preserve, protect, and/or sell Burke Decor's assets, to operate Burke Decor, as well as to collect rents and revenues received by Burke Decor.

88.    As set forth herein, Defendants have transferred receivables and loaned amounts to unauthorized entities and for purposes not permitted under the Growth LOC.  They have over-reported inventory and under-reported accounts payable, creating a dramatically false picture of financial health.  Defendants have moved receivables into accounts other than the Designated Checking Account, so that Ampla could not calculate or collect the sums due to it from that account as set forth in the Growth LOC.

23

89.     In addition, Ms. Burke has made recent representations to Ampla suggesting that Burke Decor is illiquid, may become insolvent, and is unable to operate while also satisfying its outstanding obligations to Ampla and other creditors.  Buke Decor has informed Ampla that it does not have sufficient access to its cash collected from revenues, and has disclosed that it has only $15,000 in operating cash as of April 1, 2024.  A March 31, 2024 Daily Dashboard provided to Ampla by Burke Decor shows that Burke Decor had negative liquidity for twenty-four days out of the month of March 2024, with a low point of *negative* $27,205.

90.     Further, Burke Decor has been placed on a MATCH List by its payment processor Shopify.  This designation signals that Burke Decor has excessive chargebacks and is a high-risk account for payment processors.  As a result of this designation, Burke Decor's payment processors are holding high cash reserves, which have further deprived Burke Decor of access to sufficient operating capital to meet its obligations.

91.     Burke Decor is also facing issues with Intuit and Paypal, who are also holding high cash reserves.  Ampla has learned that Burke Decor has collected funds from customers (on pre-payment), but has not fulfilled related orders.  The value of Burke Decor's outstanding customer obligations is unknown at this time, but upon information and belief, is estimated to be in the millions of dollars.

92.     Burke Decor's President, Erin Burke, is struggling to resolve the payment processor issues, loan defaults, and business operations.  She has hired two different restructuring officers simultaneously, has engaged investment banks, and has attempted potential sales of the business.  None of these actions has meaningfully improved the business or financial condition of Burke Decor.  In light of these additional expenditures and continued operational failures, Ampla believes that there is a substantial likelihood that Burke Decor will continue to

deplete its resources—thereby diminishing and devaluing Ampla's Collateral and, in the end, preventing Ampla from recovering all money due it.

93.     Appointment of a receiver would provide greater oversight over Burke Decor's operations and financial decisions, thereby providing greater security over the Collateral. Further, as an objective third party, the receiver will have the ability to administer the operations and assets of Burke Decor impartially, and negotiate resolutions to other ongoing business difficulties that Burke Decor is facing.

**COUNT V**
**Fraud – Burke Decor and Erin Burke**

94.     Ampla incorporates by reference the foregoing allegations.

95.     Burke Decor and Erin Burke made material misrepresentations of fact in writing to Ampla when they misrepresented Burke Decor's financials, specifically inventory and accounts payable amounts that were inaccurately reported as of June 2023 or earlier and continued to be inaccurately reported into 2024.  As set forth herein, Burke Decor's actual inventory balances were 57% *lower* than Burke Decor and Ms. Burke had reported to Ampla, and Burke Decor's actual accounts payable balances were 142% *higher* than Burke Decor and Ms. Burke had reported to Ampla.

96.     Burke Decor and Erin Burke would have had knowledge of the falsity of these records based on their daily operations of their business.

97.     Burke Decor and Erin Burke submitted the false records with the intent of inducing reliance by Ampla, specifically that Ampla would continue to extend additional loan amounts.

98.     Ampla was entitled to rely on Burke Decor and Erin Burke's financial records, and Ampla did so reasonably and justifiably.  Ampla extended additional loan amounts into

August 2023 based upon Burke Decor's misrepresentations about its financial condition and compliance with reporting requirements under the Growth LOC. Further, based on Ampla's reasonable reliance on Erin Burke and Burke Decor's knowing and intentional misrepresentations, Ampla did not take steps at that time to pursue remedies available to it under the Growth LOC. Absent accurate disclosures from Burke Decor, Ampla did not have the means to determine the true nature of the information by exercising ordinary diligence.

99.     Burke Decor and Erin Burke's conduct has proximately harmed Ampla in the amount of additional credit extended on the basis of Burke Decor and Erin Burke's fraudulent misrepresentations. Additionally, Ampla has been proximately harmed in the amount of the entire Outstanding Amount, because, based on Ampla's reasonable reliance on Erin Burke and Burke Decor's knowing and intentional misrepresentations, Ampla did not take steps at that time to pursue remedies available to it under the Growth LOC.

100.    Ampla is entitled to an award of compensatory and punitive damages against Burke Decor and Erin Burke.

<u>**COUNT VI**</u>
**Fraudulent Concealment – Burke Decor and Erin Burke**

101.    Ampla incorporates by reference the foregoing allegations.

102.    Burke Decor and Erin Burke had a duty to disclose material facts, specifically Burke Decor's accurate financials as to inventory and accounts payable amounts that were falsely reported as of June 2023 or earlier and continued to be falsely reported until 2024. As set forth herein, Burke Decor's actual inventory balances were 57% *lower* than Burke Decor and Ms. Burke had reported to Ampla, and Burke Decor's actual accounts payable balances were 142% *higher* than Burke Decor and Ms. Burke had reported to Ampla. The maintenance and

submission of false financial records was a violation of the representations and warranties under the Growth LOC.

103. Additionally, Burke Decor and Erin Burke had a duty to disclose and make available to Ampla for collection Burke Decor's receivables. Instead, as described herein, Burke Decor and Erin Burke diverted receivables, concealing those receivables from Ampla, and preventing Ampla from collecting receivable due to it under the Growth LOC.

104. Burke Decor and Erin Burke had knowledge of Burke Decor's actual and accurate financial records and receivables based on their daily operations of their business, and thus knew the true data they were bound to disclose to Ampla.

105. Nonetheless, Burke Decor and Erin Burke failed to discharge their duties to disclose. Rather than report accurate inventory, accounts payable, receivables, and other financials, they provided Ampla with inaccurate financials that concealed Burke Decor's true condition by over-representing inventory, under-representing accounts payable, and concealing receivables. Burke Decor and Erin Burke did not correct the inaccuracies.

106. Burke Decor and Erin Burke knowingly concealed Burke Decor's accurate financial condition and receivables with the intent of inducing reliance by Ampla, specifically that Ampla would continue to extend additional loan amounts and would not collect the full amount of receivables owed to it.

107. Ampla was entitled to rely on Burke Decor and Erin Burke's financial records and reported receivables, and Ampla did so reasonably and justifiably. Ampla extended additional loan amounts into August 2023 based the concealment of Burke Decor's actual financial condition and failure to comply with reporting requirements under the Growth LOC. Ampla collected less receivables than it was owed based upon the concealment of Burke Decor's actual

receivables.  Further, based on Ampla's reasonable reliance on Erin Burke and Burke Decor's knowing and intentional concealment, Ampla did not take steps at that time to pursue remedies available to it under the Growth LOC.  Absent accurate disclosures from Burke Decor, Ampla did not have the means to determine the true nature of the information by exercising ordinary diligence.

108.     Burke Decor and Erin Burke's conduct has proximately harmed Ampla in the amount of additional credit extended on the basis of Burke Decor and Erin Burke's fraudulent concealment.  Additionally, Ampla has been proximately harmed in the amount of the additional receivables it would have collected had Burke Decor and Erin Burke not diverted and concealed those receivables.  Additionally, Ampla has been proximately harmed in the amount of the entire Outstanding Amount, because, based on Ampla's reasonable reliance on Erin Burke and Burke Decor's knowing and intentional concealment, Ampla did not take steps at that time to pursue remedies available to it under the Growth LOC.

109.     Ampla is entitled to an award of compensatory and punitive damages against Burke Decor and Erin Burke.

<strong><u>COUNT VII</u></strong><br><strong>Aiding and Abetting – Erin Burke</strong>

110.     Ampla incorporates by reference the foregoing allegations.

111.     To the extent that it is determined that only Burke Decor fraudulently misstated or concealed material facts, Erin Burke aided and abetted the fraud.

112.     As alleged herein, the maintenance of false financial records, the submission of those records to Ampla, and the concealment of material financial information from Ampla constitute multiple underlying frauds.

113.    By virtue of her role as principle of Burke Decor, her daily operation of the business, and her interaction with Ampla, Erin Burke had knowledge of the frauds.

114.    Erin Burke provided substantial assistance in achieving the frauds by maintaining and submitting the false financials, helping to conceal Burke Decor's actual financial condition and receivables, otherwise enabling the fraud, and/or failing to act when required to do so.

115.    Her actions proximately caused the harm to Ampla set forth in its fraudulent misrepresentation and fraudulent concealment claims herein.

116.    Ampla is entitled to an award of compensatory and punitive damages against Erin Burke.

## COUNT VIII
### Costs and Reasonable Attorney Fees

117.    Ampla incorporates by reference the foregoing allegations.

118.    The Credit Agreement provides at Paragraph 26 that if Burke Decor defaults on its obligations, Ampla is entitled to recover:

> any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations, or any of Lender's rights or interests therein or thereto . . .

(Credit Agreement, ¶26).  Further, because Ms. Burke's, Au Marche's, and Furnishings' liability under the respective guaranties are triggered as described above, Ampla is entitled to recover these costs and attorneys' fees against all four of these Defendants, jointly and severally.

119.    At the conclusion of this lawsuit, Ampla will submit to the Court for *in camera* review an accounting of all costs and attorneys' fees sought herein.

## COUNT IX
### Sale of Collateral

120.     Ampla incorporates by reference the foregoing allegations.

121.     In order to secure the obligations of Burke Decor, Burke Decor – through the

Growth LOC – pledged the Collateral to Ampla.

122.     Because of Burke Decor's defaults, as set forth herein, and pursuant to the terms

of the Growth LOC, Ampla is entitled to foreclose and sell the Collateral described herein at

public or private sale in accordance with the lien priority of all parties with an interest in the

Collateral.

123.     The SBA may have interest in the Collateral, by virtue of filed UCC-1 financing

statements.

## COUNT X
### Accounting

124.     Ampla incorporates by reference the foregoing allegations.

125.     Ampla lent money to Burke Decor pursuant to the Growth LOC, and had a right

to collect a percentage of all of Burke Decor's receivables as payment.

126.     Burke Decor failed to deposit all of its receivables into the Designated Checking

Account to facilitate Ampla's calculation and realization of the Collection Amount.

127.     Absent an accounting from Burke Decor, the actual value of receivables subject to

collection cannot be determined and, as a result, the amount due and owing to Ampla cannot be

determined with accuracy.

128.     Ampla is entitled to an accounting of all of Burke Decor's receivables from the

outset of the Growth LOC through the present.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff Ampla, LLC requests the Court to enter the following relief:

A.      On Count I, judgment in favor of Ampla and against Burke Decor for breach of contract, and an award of compensatory damages in an amount equal to the Outstanding Balance;

B.      On Count II, judgment in favor of Ampla and against Ms. Burke for breach of the Limited Guaranty, and an award of compensatory damages in an amount equal to the Outstanding Balance;

C.      On Count III, judgment in favor of Ampla and against Au Marche and Furnishings for breach of the Secured Corporate Guaranty, and an award of compensatory damages in an amount equal to the Outstanding Balance;

D.      On Count IV, that a receiver be appointed to take possession of, preserve, and operate Burke Decor, and exercise all powers contemplated in the Growth LOC and all powers granted within the equitable powers of this Court;

E.      On Counts V, VI, and VII judgment in favor of Ampla and against Burke Decor and Erin Burke for fraudulent misrepresentations and/or fraudulent concealment, and an award of compensatory and punitive damages;

F.      On Count VIII, that Ampla be awarded all reasonable attorneys' fees and costs in enforcing its rights under the Growth LOC;

G.      On Count IX, that Ampla be found to have a good and valid lien in the Collateral, and that the Collateral be sold at a public or private sale;

H.      On Count X, that Ampla be found entitled to an accounting of all of Burke Decor's receivables from the outset of the Growth LOC through Present;

I.    An award of Ampla's reasonable attorneys' fees and costs; and

J.    Such other and further relief that is fair and equitable.


                          Respectfully submitted,


                          /s/ *David P. Shouvlin*
                          DAVID P. SHOUVLIN (0066154)
                          PORTER WRIGHT MORRIS & ARTHUR LLP
                          41 S. High Street, Suite 3100
                          Columbus, OH 43215-6194
                          Phone: (614) 227-1980
                          Fax: (614) 227-2100
                          dshouvlin@porterwright.com

                          McDANIEL M. KELLY (0097628)
                          PORTER WRIGHT MORRIS & ARTHUR LLP
                          950 Main Avenue, Suite 500
                          Cleveland, OH 44113
                          Phone: (216) 443-9000
                          Fax: (216) 443-9011
                          mkelly@porterwright.com

                          *Attorneys for Plaintiff, Ampla LLC*