Ampla

# SUPPLEMENT TO
# GROWTH LINE OF CREDIT AGREEMENT

| Term | Amount | Simple Explanation |
|---|---|---|
| **Maximum Line Size** | **$16,000,000** | As your business grows, you can draw up to this amount.<br><br>(See the Agreement for more detail) |
| **Credit Limit** | **$8,217,028** | The amount you can draw today.<br><br>(See the Agreement for more detail) |
| **Credit Limit calculation** | <table><tr><th>Metric</th><th>Amount</th><th>Advance Rate</th><th>Limit</th></tr><tr><td>Monthly Cashflows</td><td>$6,847,523</td><td>120%</td><td>$8,217,028</td></tr><tr><td>Total</td><td></td><td></td><td>$8,217,027</td></tr></table> | This is how your Credit Limit is calculated. This limit is based on business performance as your business metrics update.<br><br>(See the Agreement for more detail) |
| **Collection Percentage Grid** | <table><tr><th>Credit Limit Utilization</th><th>Collection Percentage</th></tr><tr><td>81-100%</td><td>40%</td></tr><tr><td>61-80%</td><td>32%</td></tr><tr><td>41-60%</td><td>24%</td></tr><tr><td>21-40%</td><td>16%</td></tr><tr><td>0-20%</td><td>8%</td></tr></table> | We collect a percentage of your Receivables for repayment. This amount is based on your Utilization of the Credit Limit.<br><br>(See the Agreement for more detail) |
| **Applicable APR** | **EFFR + 10.00%** | This is the annualized cost to you.<br><br>There are no late payment fees, underwriting fees, or any other hidden fees.<br><br>(See the Agreement for more detail) |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | **NO** |

Exhibit 1

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50C55A7A

# Ampla

# GROWTH LINE OF CREDIT AGREEMENT

**1. INTRODUCTION.** This Growth Line of Credit Agreement (together with the accompanying Growth Line of Credit Agreement Supplement ("Supplement") and the accompanying Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits), the "Agreement") governs your revolving business line of credit and security agreement and any and all Advances (as defined below) hereunder (together, the "Line of Credit") from Ampla, LLC. Please read it and keep it for your reference. In this Agreement, "Borrower" means the Borrower identified on the signature page of this Growth Line of Credit Agreement. The word "Lender" means Ampla, LLC, its agents and representatives, as well as its successor(s) and assign(s).

2. **CERTAIN DEFINITIONS**. For purposes of this Agreement, the term:

"Access Details" means the username, login and password details for Borrower's Designated Checking Account, Card Processor Account(s), Ecommerce Account(s), and third-party services which include, but are not limited to, Digital Marketing Accounts and such other accounts as may be required from time to time, provided by Borrower to Lender as part of the application process, either directly or via 3rd party authentication services;

"Advance" shall have the meaning set forth in Section 8;

"Advance Rate," means, the applicable percentage set forth in the above Supplement, or such higher or lower percentage as determined by Lender in its sole discretion from time to time;

"Advance Request" shall have the meaning set forth in Section 9;

"Applicable APR" means, as of any date of determination, the annual percentage rate then identified as the Applicable APR in the Online Account; it being acknowledged and agreed that (x) the Applicable APR shall equal the Base Rate plus the Applicable Margin; and (y) any such increase or decrease shall in no way affect Borrower's obligation to pay any amounts owed by Borrower hereunder; notwithstanding the foregoing, for Texas Borrowers only, the Applicable APR shall not exceed the weekly ceiling applicable to extensions of commercial credit only, as such weekly ceiling is defined in the Texas Finance Code and as documented in the Texas credit letter published weekly by the Texas Office of Consumer Credit Commissioner;

"Applicable Margin" means, as of any date of determination, the annual percentage rate then identified as the Applicable Margin in the Online Account, it being acknowledged and agreed that the initial Applicable Margin shall equal the amount set forth on the accompanying Supplement;

"Available Advance Amount" means, as of any date of determination, an amount equal to (1) the Credit Limit, *minus* (2) Principal Outstanding, *minus* (3) Third-Party Financing obligations outstanding;

"Base Rate" means, as of any date of determination, a rate per annum rounded upwards, if necessary, to the nearest 1/100 of 1% (2 decimal places) equal to the rate of interest which is identified and normally published by the New York Federal Reserve at approximately 9:00 AM on the business day prior to the date of determination for the date that is two (2) business days prior to the date of determination, on a webpage called the Effective Federal Funds Rate ("EFFR") (or any equivalent page used by the New York Federal Reserve or, if the New York Federal Reserve no longer reports the EFFR, another nationally-recognized rate reporting source acceptable to Lender), calculated as a volume-weighted median of overnight federal funds transactions reported in the FR 2420 Report of Selected Money Market Rates. For the avoidance of doubt, the Base Rate as of any date of determination shall be the EFFR as of two (2) business days prior. If the New York Federal Reserve (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the EFFR, Lender may select a comparable replacement index or replacement page, as the case may be, in its sole discretion. Notwithstanding the foregoing, in no event shall the Base Rate be less than two percent (2.00%) at any time.

"Card Processor Account" means, Borrower's payment processor account with Shopify Pay, Stripe, or such other third-party card processor deemed acceptable to Lender at Lender's sole discretion;

"Collection Amount" means, with respect to each day Obligations remains outstanding, the amount that Lender is entitled to debit from the Designated Checking Account, which shall equal the applicable amount of the Daily Receivables for the prior day multiplied by the Collection Percentage;

"Collection Percentage" means the daily collection percentage of Daily Receivables set out in Lender's Collection Percentage Grid as made available to Borrower via the Online Account;

"Collection Percentage Grid" means, the schedule as set forth in the Online Account of (i) the Collection Percentage, which is a relational function determined in Lender's sole discretion based on (ii) Credit Limit Utilization;

"Credit Limit" means, as of any date of determination, the amount then identified as the Credit Limit in the Online Account; it being acknowledged and agreed that the Credit Limit shall be equal to: (i) "Monthly Cashflows" multiplied by the "Advance Rate"; but in no event shall the Credit Limit exceed the Maximum Line Size;

"Credit Limit Utilization" means, as of any date of determination, a percentage equaling: the maximum of, for all Advances that remain outstanding, (x) the total Principal

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50C55A7A

**Ampla**  GROWTH LINE OF CREDIT AGREEMENT

Outstanding at the time of disbursement of such Advance, divided by (y) the Credit Limit at the time of disbursement of such Advance; it being understood that the greater the Credit Limit Utilization, the greater the Collection Percentage will be, as determined in Lender's sole discretion;

"Daily Interest Charge" means, as of any date of determination, an amount equal to the product of (x) the Daily Interest Rate; and (y) Principal Outstanding as of such date immediately prior to any application and allocation of principal in connection with any payment, if any, made by Borrower on such date, as set forth on the Lender's books and records;

"Daily Interest Rate" means, a non-compounding rate obtained by dividing (x) the Applicable APR by (y) three hundred and sixty (360);

"Daily Receivables" means, with respect to any particular day, the total amount of Receivables received on such day;

"Debit Schedule" shall have the meaning set forth in Section 11;

"Designated Checking Account" shall be a checking account in Borrower's name and hosted at a banking institution chosen by Lender in Lender's sole discretion;

"Digital Marketing Account" means, Borrower's accounts with Google (including AdWords and Analytics), Facebook, and any other third-party digital marketing platform through which Borrower purchases advertisements;

"Ecommerce Platform" means Shopify or such other ecommerce platforms as approved in Lender's sole discretion;

"Interest Outstanding" means, as of any date of determination, the aggregate amount of accrued and unpaid interest as set forth on the Lender's books and records;

"Maximum Line Size" means the capped ceiling as set and as may be increased by Lender in its sole discretion for total Advances Lender will make under this Agreement, notwithstanding any other terms to the contrary, as set forth initially in the Supplement and as updated by Lender in the Online Account;

"Monthly Cashflows" means, the lesser of (a) the last 30 days of revenue-related cash receipts and (b) the 30-day average of the last 90 days of revenue-related cash receipts, adjusted at Lender's sole discretion for seasonality, accounts receivable, uninvoiced sales orders, expected future growth, historical non-recurring sales, and such other factors to allow Lender in its sole discretion to estimate Borrower's future, near-term, anticipated Receivables for purposes of underwriting and approving, again in its sole discretion, Advances hereunder. For the avoidance of doubt, Monthly Cashflows shall only include ecommerce sales made through a Card Processor Account and retail sales made through

acceptable retail channels. The retail channels considered acceptable are determined at Lender's sole and absolute discretion;

"Obligations" means, with respect to Borrower, all obligations to perform acts and refrain from taking action hereunder, including, without limitation, obligations to pay all amounts owed hereunder including, without limitation, Principal Outstanding and Interest Outstanding;

"Online Account" means, Borrower's login details and account information on Lender's online customer portal;

"Principal Outstanding" means, as of any date of determination, the aggregate outstanding principal balance of all Advances hereunder as set forth on the Lender's books and records, which, for the avoidance of doubt, does not include interest as Lender does not compound interest;

"Processing Trial" shall have the meaning set forth in Section 8;

"Receivables" means any and all cashflows that Borrower generates as part of its business;

"Scheduled Payment Date" means every business day in which the bank hosting the Designated Checking Account is open for business;

"Supplement" means the summary of certain terms included at the beginning of this Agreement and forming a part of this Agreement; and

"Third-Party Financing" means Borrower's outstanding debt-financing obligations to third-parties, including but not limited to, credit card advance companies, cash advance companies, or working capital lenders.

**3. EFFECTIVE DATE.** This Agreement begins on the date Lender countersigns, below. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower under the Line of Credit (including, for the avoidance of doubt, any and all Advances) until Lender has received the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits).

**4. AUTHORIZATION.** Borrower agrees that the Line of Credit (including, for the avoidance of doubt, any and all Advances) made by Lender to Borrower and any and all Advance Requests (as defined below) shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to duly authorized requests on its behalf.

**5. ACCESS TO ONLINE ACCOUNT.** When Borrower signs in to its Online Account, Borrower can obtain information about Borrower's Line of Credit, make an Advance Request as

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50C55A7A
Case: 4:24-cv-00869-JG Doc #: 1-1 Filed: 05/14/24 4 of 16. PageID #: 36

**Ampla**                                                                                    GROWTH LINE OF CREDIT AGREEMENT

provided for herein and perform such other actions made available by Lender from time to time. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's username and password to Borrower's Online Account with any third-party. Borrower must promptly report any unauthorized use of Borrower's Online Account to Lender by telephone at (833) 678-7483 or by email at compliance@getampla.com.

**6. LINE OF CREDIT FOR SPECIFIC PURPOSES ONLY.** The proceeds of the Line of Credit (including, for the avoidance of doubt, any and all Advances) may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 52 below, and not for any other purposes. In addition, the Line of Credit (including, for the avoidance of doubt, any and all Advances) will not be used for personal, family or household purposes, and Borrower is forever estopped from taking the position that such Loan (including Advances) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the proceeds of the Line of Credit (including, for the avoidance of doubt, any and all Advances) for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply to the Line of Credit (including, for the avoidance of doubt, any and all Advances), the Online Account or this Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Line of Credit (including, for the avoidance of doubt, any and all Advances) conforms to this section. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Line of Credit (including, for the avoidance of doubt, any and all Advances) is in fact obtained or used or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Line of Credit (including, for the avoidance of doubt, any and all Advances) been made for personal, family or household purposes.

**7. MAINTENANCE OF BORROWER'S BANK ACCOUNT; DUTY TO COLLECT RECEIVABLES; DUTY TO HOLD RECEIVABLES IN TRUST.**

A. Borrower agrees to maintain funds in the Designated Checking Account in amounts that are sufficient to enable the processing of any payment that Borrower is obligated to pay Lender pursuant to this Agreement. Borrower shall keep the Designated Checking Account open until the Principal Outstanding, the Interest Outstanding, and any and all other amounts owed hereunder have been paid to Lender in full and no further Advances are to be made hereunder.

B. Borrower further agrees to collect all Receivables diligently and promptly in accordance with applicable law, to diligently and promptly account for and report to Lender all Receivables due and unpaid and all payments received in connection with any and all Receivables, in accordance with the terms of this Agreement, in order to allow us to debit the Designated Checking Account for the Collection Amount in accordance with the terms of this Agreement.

C. Borrower further agrees to hold the Receivables and all payments received in connection therewith in trust for Lender and not sell or otherwise transfer, convey or dispose of the Receivables inconsistent with the terms of this Agreement.

**8. ADVANCES; PROCESSING TRIAL.**

A. Subject to the terms and conditions hereunder, the Lender may in its sole and absolute discretion make an advance to the Borrower under the Line of Credit following its receipt of an Advance Request (as defined below) by disbursing proceeds from time to time to the Borrower in the manner set forth herein (each an "<u>Advance</u>" and, collectively "<u>Advances</u>"). Borrower acknowledges and agrees that the Lender shall not be required to, and the Borrower shall not request the Lender to, make an Advance (i) in an amount that is less than certain minimum advance amounts established by Lender in its sole and absolute discretion from time to time, (ii) in an amount that exceeds the Available Advance Amount as of such date. In the event that Lender has made an Advance in an amount that exceeds the Available Advance Amount as of the date of such Advance, Borrower agrees (x) at Lender's request, to immediately repay the amount of such excess; and (y) that any such excess will not be deemed to constitute an increase in the Credit Limit hereunder.

B. Following the entry into this Agreement, but prior to any Advance to Borrower, Borrower hereby permits Lender to conduct a preliminary processing trial to test: (a) that the ACH payment functionality with Borrower is operating as Lender expects; (b) that Lender can access data within the Card Processor account and/or Ecommerce Platform account correctly; (c) that Borrower's transactions are being correctly processed through the Card Processor or Ecommerce Platform and are visible to Lender as Lender requires; and (d) such other related activities and functionalities Lender deems reasonably necessary to provide for the smooth functioning of the activities contemplated by this Agreement; (together, the "<u>Processing Trial</u>"). For the avoidance of doubt, any trials or tests of ACH payment transactions pursuant to this paragraph will be for a nominal amount (and in any case not more than $50), and will be refunded to Borrower in full or deducted from the Collection Amount (in either case, at Lender's sole discretion). Lender will make a determination as to whether to issue an Advance to Borrower promptly after the commencement of the Processing Trial. Nothing herein will create an obligation on Lender's behalf to issue the Advance to Borrower, and Lender expressly reserves the right to terminate the Agreement if Lender determines in Lender's absolute discretion that the Processing Trial has been unsuccessful, in which case, this Agreement will automatically

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50C55A7A

# GROWTH LINE OF CREDIT AGREEMENT

terminate and Lender will promptly repay to Borrower any funds received by Lender from Borrower in connection with the Processing Trial.

**9. ADVANCE REQUESTS.** The Borrower may request an Advance ("Advance Request") by (i) accessing the Online Account and completing the steps delineated therein for the online submission of an Advance Request or (ii) using any other method that Lender may in its sole and absolute discretion make available to Borrower from time to time. Following Lender's approval of an Advance Request, Lender will make an Advance to Borrower by disbursing the related proceeds by making an ACH credit or wire transfer to the Designated Checking Account. Borrower expressly acknowledges that, due to transaction processing, proceeds from any Advance disbursement may take up to two (2) business days following Lender's approval of the related Advance Request to be actually received by the Borrower.

**10. CONDITIONS OF WILLINGNESS TO CONSIDER LENDING.** Lender may decide not to approve an Advance Request or suspend Borrower's ability to make an Advance Request if on the date of such Advance Request, (i) Borrower's representations and warranties set forth in this Agreement are untrue or incorrect on the date of such Advance Request and/or an earlier date contemplated by such representation or warranty; (ii) an event has occurred that constitutes an Event of Default hereunder or which, with notice or the passage of time or both, would constitute an Event of Default hereunder, (iii) the amount of the Advance being requested by Borrower pursuant to such Advance Request exceeds the Available Advance Amount.

**11. INTEREST ON ADVANCES; DEBIT SCHEDULE; RIGHT TO PREPAYMENT.**

A. Advances shall accrue interest daily in an amount equal to the Daily Interest Charge and shall be payable in arrears on each Scheduled Payment Date. Interest payable shall be computed on the basis of a 360-day year, 30-day month.

B. Principal and interest on the Advances and other amounts owed hereunder shall be regularly paid by the Borrower as set forth below (the "Debit Schedule"). Borrower covenants and agrees that Borrower will cause all Receivables to be paid into the Designated Checking Account. Borrower hereby authorizes Lender to originate a debit or debits from the Designated Checking Account to provide for the payment each day of the Collection Amount, which is determined each day based on the Collection Percentage. Borrower will not change the Card Processor or Ecommerce Platform without Lender's prior written consent. Each day Obligations remain outstanding, Lender will calculate the Collection Amount to which Lender is entitled under this Agreement, based on the agreed Collection Percentage and the previous day's total daily sales as recorded in either the Card Processor account or Ecommerce Platform account, as applicable. ACH payments will be initiated for each Collection Amount. ACH payments can only be initiated on business days.

No further collections or ACH payments will be taken after Obligations are paid in full. Borrower acknowledges and agrees that should Lender fail to receive any portion of the foregoing payment amount on any Scheduled Payment Date, the Lender is authorized, but not required, to initiate ACH debit entries to the Designated Checking Account on any subsequent business day until such payment amount and any and all other amounts owed hereunder, in each case as set forth in the Lender's books and records are paid in full.

C. Borrower has the right to prepay all Obligations at any time without penalty.

**12. PROMISE TO PAY.** Borrower agrees to make to Lender, and authorizes Lender to collect, each of the payments (i.e., debits) contemplated by Section 11 in the manner contemplated thereby and as provided in the accompanying Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits). For the avoidance of doubt, Borrower agrees to pay Lender the balance of all Obligations in accordance with the terms of this Agreement.

**13. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable originate a debit or debits from the Designated Checking Account to provide for the payment each day of the Collection Amount, the Borrower shall make expedient efforts (and in no event more than 24 hours late) to transfer funds to Lender via wire transfer, automatic transfer, or via another online service provided by Lender from an account at an institution offering such service in U.S. Dollars.

**14. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments between principal and interest owed hereunder in any manner Lender chooses in Lender's sole discretion; it being understood that the Lender will generally allocate and apply payments in the following sequential order: (i) Interest Outstanding; and (iii) the Principal Outstanding.

**15. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor. Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement and Borrower is estopped from asserting otherwise.

**16. RIGHT TO PAY TOTAL OBLIGATIONS AT ANY TIME.** Borrower may pay off Borrower's Line of Credit in

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50C55A7A
Case: 4:24-cv-00869-JG Doc #: 1-1 Filed: 05/14/24 6 of 16. PageID #: 38

Ampla

GROWTH LINE OF CREDIT AGREEMENT

whole on any business day by paying Lender the sum total of all Obligations owed hereunder.

**17. SECURITY INTEREST; PROTECTING THE SECURITY INTEREST; LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.**

A. Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all Obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description whether owing under this Agreement or any other agreement, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, Interest Outstanding. The Collateral includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) all Receivables including but not limited to any amounts owing to Borrower now or in the future; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

B. Borrower agrees that Lender may file any financing statement, lien entry form or other document Lender requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender as may be necessary to accomplish said filing and to do whatever Lender deems necessary to protect Lender's security interest in the Collateral.

C. Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of Receivables, other accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**18. TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**19. INSURANCE.** Borrower shall procure and maintain insurance with insurance companies that the Borrower believes are financially sound and reputable, in such amounts with such deductibles and covering such risks as the Borrower believes in good faith are customarily carried by companies engaged in similar businesses. Borrower shall promptly notify Lender of any loss of or damage to the Collateral. Borrower shall add Lender to any certificates of insurance in the ordinary course of business while Obligations remain outstanding.

**20. REPAIRS AND MAINTENANCE.** As applicable and specific to the type of Collateral at issue, Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance (other than a lien or encumbrance by the Lender) may ever attach to or be filed against the Collateral.

**21. USE OF TESTIMONIALS.** Subject to Borrower's consent, Lender may obtain testimonials, including testimonials on why Borrower needed the Line of Credit and how the Line of Credit has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower grants Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose,

# GROWTH LINE OF CREDIT AGREEMENT

with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower as a credit in connection with any photograph and testimonial. Borrower and each signatory of Borrower waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each signatory of Borrower release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**22. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower is not a sole proprietorship; (ii) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (iii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iv) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (v) the true and correct legal name of the Borrower is set forth in the application; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws, and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or

prospects or the value of the Collateral; (ix) Borrower has disclosed in writing to Lender all of its Third-Party Financing obligations; (x) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of the Collateral before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within 6 months of the date hereof; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**23. BORROWER'S OPERATING COVENANTS.** Borrower covenants, and without limitation to any other representations, warranties or covenants in this Agreement: (i) to maintain existing lines of business; (ii) to not incur Third-Party Financing obligations without the prior written consent of Lender; (iii) to not divert any Receivables away from the Designated Checking Account to any other account held by any institution, without the prior written consent of Lender; (iv) to not close the Designated Checking Account nor deny Lender access thereto, or instruct or, except to the extent prohibited by applicable law, acquiesce to, any bank or other person closing such Designated Checking Account or denying Lender access thereto; (v) to not enter into any deposit account control agreement related to the Designated Checking Account; and (vi) to not take any steps to avoid, delay, or circumvent Borrower's obligation to make Receivables promptly available to Lender in the Designated Checking Account at any time, including without limitation by: (a) taking any action that might discourage Borrower's customers' use of credit cards, debit cards or other payment cards, and Borrower will not permit any event to occur that may have an adverse effect on the use, acceptance or authorization of credit cards, debit cards, or other payment cards; (b) changing or adding any credit card processors or e-commerce platforms without Lender's prior written consent; (c) amending or terminating the processing agreement with the Card Processor without Lender's prior written consent; (d) not promptly transferring Receivables into the Designated Checking Account from any third-party account hosting said Receivables, to which Borrower has transfer access, within 14 days of receipt in such third-party account, or within the earliest-allowed, but later period of time if and only if mandated by such third-party's account-transfer rules; or (e) putting a stop order or blocking any ACH or other remittance of Receivables to Borrower, or taking any action that results in a stop order or block.

**24. INTEREST EXCEEDING PERMITTED LIMIT.** If the Line of Credit is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if

required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**25. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower authorizes Lender to obtain business and personal credit bureau reports in Borrower's name at any time and from time to time for purposes of deciding whether to approve the requested Line of Credit and any Advances made pursuant hereto or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's request, Lender will advise Borrower if Lender obtained a credit report and Lender will give Borrower the credit bureau's name and address. Borrower agrees to submit current financial information, a new credit application, or both, in Borrower's name at any time promptly upon Lender's request. Lender may report Lender's credit experiences with Borrower to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower is hereby notified that a negative credit report reflecting on Borrower's credit record may be submitted to a credit reporting agency if Borrower fails to fulfill the terms of their respective credit obligations hereunder.

**26. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations, or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender rights hereunder. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will be payable on demand. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**27. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower agrees to provide Lender with such information about the financial condition and operations of Borrower, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**28. TELEPHONE COMMUNICATIONS.** Borrower and hereby expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, marketing partners, agents and others calling at Lender's request or on its behalf, at any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers). Borrower agrees that such communications may be initiated using an automated telephone dialing system.

**29. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damages, liabilities or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**30. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not, without Lender's written consent: (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation. Notwithstanding the foregoing, no consent shall be required of Lender if, following any such merger, consolidation, sale, joint venture, partnership or other transaction, (x) the current majority owner of Borrower remains the majority owner of Borrower post transaction, and (y) any transfer of equity in Borrower to any person following such transaction is no more than 40% of all equity outstanding in Borrower.

**31. CHANGE IN LEGAL STATUS.** Without Lender's consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such organizational identification number.

**32. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Borrower fails

**Ampla**

# GROWTH LINE OF CREDIT AGREEMENT

to comply with the Debit Schedule in any respect; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any other term, condition or promise within this Agreement, including but not limited to providing Access Details and similar reports and other information Lender requires; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9−102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or the Collateral, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company, or an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to the Collateral; (xxi) any act by or against, or relating to Borrower or the Collateral pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of the Collateral; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or Borrower denies it has any further liability or obligation hereunder; (xxiv) any person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his support agreement in favor of Lender; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held), provided, however, that any such change in compliance with paragraph 30 hereof shall not be deemed "material" for the purposes of this section xxv; (xxvi) if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**33. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. <u>Refrain from Making Advances and Terminate Borrower's Ability to Make Advance Requests</u>: Lender may terminate the Line of Credit, refrain from making Advances and/or terminate Borrower's ability to make Advance Requests hereunder.

B. <u>Debit Amounts Due From Borrower's Accounts</u>: Lender may debit from Borrower's Designated Checking Account any and all amounts to bring current all Obligations.

C. <u>Accelerate Indebtedness</u>: Lender may declare any and all Obligations immediately due and payable, without notice of any kind to Borrower.

D. <u>Assemble Collateral</u>: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all

certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E.  Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower other persons as required by law (if any), reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All reasonable and customary expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F.  Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

G.  Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

H.  Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I.  Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J.  Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**34. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 35 below, Borrower and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be brought in any court of the state of New York or in the United States District Court for the Southern District of New York, and

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50CE5A7A
Case: 4:24-cv-00869-JG Doc #: 1-1 Filed: 05/14/24 11 of 16. PageID #: 43

Ampla

GROWTH LINE OF CREDIT AGREEMENT

Borrower waives personal service of process. Borrower and Lender agree that venue is proper in such courts.

**35. ARBITRATION AND CLASS ACTION WAIVER. THE PARTIES AGREE THAT AT THE ELECTION OF ANY PARTY, ALL CLAIMS BETWEEN BORROWER AND LENDER SHALL BE RESOLVED THROUGH MANDATORY BINDING INDIVIDUAL ARBITRATION PURSUANT TO THIS SECTION.**

A. Arbitration procedures are generally simpler than the rules that apply in court, and discovery is more limited. Other rights that Borrower or Lender would have in court may also not be available in arbitration. For example, under this arbitration agreement, Borrower or Lender will not have the right to (i) have a court or jury decide the claim being arbitrated, (ii) engage in pre-arbitration discovery to the same extent that Borrower or Lender could in court, (iii) as set forth below, participate as a representative or member of any class or of claimants in a class action, in court or in arbitration, relating to any claim subject to arbitration, or (iv) join or consolidate claims other than Borrower's or Lender's own claims. Any arbitration award and any judgment confirming it will apply only to a specific Claim and cannot be used in any other case except to enforce the award.

B. The term "Claims" is to be given the broadest possible meaning, and includes without limitation Claims arising from or relating to (i) this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, (ii) any transactions effected pursuant to this Agreement, (iii) terms of or change or addition of terms to this Agreement, (iv) collection or enforcement of any obligation arising from this Agreement, (v) advertisements, promotions, or oral or written statements relating to this Agreement or any transactions between us pursuant to this Agreement, (vi) Claims between Borrower and and Lender or Lender's parent corporations, wholly or majority owned subsidiaries, affiliates, predecessors, successors, assigns, agents, independent contractors, employees, officers, directors or representatives arising from any transaction between us pursuant to this Agreement, and (vii) Claims regarding the validity, enforceability, or scope of this Arbitration section or this Agreement, including but not limited to whether a given claim or dispute is subject to arbitration.

C. The parties agree that any Claim against Borrower or Lender shall be, at the election of any party, resolved by mandatory binding arbitration within a reasonable time period not to exceed one-hundred-and-eighty (180) days. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the JAMS Streamlined Arbitration Rules & Procedures except as otherwise agreed in this Agreement; if JAMS is unavailable to administer the arbitration, then the arbitration shall be administered by the American Arbitration Association in accordance with its procedures or any other mutually agreeable arbitrator. The parties agree that the arbitration shall be conducted by a single arbitrator. The arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable law. The arbitration hearing shall occur in the federal judicial district where Borrower is located, and may be conducted on the basis of documents only or through a telephone or in-person hearing. The arbitrator's decisions are final and binding, are as enforceable as any court order, and are subject to very limited review by a court as set forth in the Federal Arbitration Act. Judgment on the award may be entered in any court having jurisdiction, subject to Section 34 above.

D. The parties agree that the costs of the arbitration (including the arbitrator's fees) shall be divided equally between them, except that Lender will consider in good faith a request by Borrower to pay the costs of arbitration.

E. EACH PARTY MAY PURSUE ARBITRATION SOLELY IN AN INDIVIDUAL CAPACITY, AND NOT AS A REPRESENTATIVE OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S OR ENTITY'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER AND LENDER WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST <u>ANY</u> OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT <u>ANY</u> PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST <u>ANY</u> OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

F. If this provision is deemed by a court or arbitrator to be unenforceable only as to some Claims asserted by a party, then the parties agree in advance that all proceedings relating to the Claims against which this provision is unenforceable should be stayed and not proceed pending the completion of the arbitration proceeding on all remaining claims.

G. If Borrower or Lender files a Claim in court, such action is not deemed to be a waiver of the right to compel arbitration of any counterclaims, cross-claims, or separate claims that may be asserted against it. In such a case, upon the election of any party,

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50CE5A7A
Case: 4:24-cv-00869-JG Doc #: 1-1 Filed: 05/14/24 12 of 16. PageID #: 44

**Ampla**

GROWTH LINE OF CREDIT AGREEMENT

the entire dispute shall be resolved in arbitration pursuant to the provisions of this section.

H. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, other applicable federal law, and, to the extent it is applicable, by New York law.

**36. JURY TRIAL WAIVER.** To the extent not prohibited by applicable law, Borrower and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 35, any such claim or cause of action shall be tried by court sitting without a jury.

**37. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**38. TERMINATION.** This Agreement shall be effective as of the date first written above and shall continue in full force and effect until the first anniversary thereof, unless earlier terminated upon an Event of Default. This Agreement shall be automatically extended for one-year terms on each anniversary of the effective date (each such anniversary, an "Anniversary Date") unless Lender or Borrower gives the other party written notice of termination at least thirty (30) days prior to the end of the applicable Anniversary Date, or until terminated earlier upon and event of Default.  Notwithstanding the foregoing, (i) this Agreement shall not terminate until Borrower has paid in full all amounts owed pursuant to the Obligations; and (ii) in addition to Lender's rights and remedies set forth herein, Lender may, at any time and subject to applicable law, terminate this Agreement and Borrower will nevertheless continue to be obligated to pay all amounts owed pursuant to the Obligations.

**39. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business.

To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. For the avoidance of doubt, Borrower and Lender and their successors or assigns retain the right to compel arbitration under Section 35 even if they assign any rights under this Agreement to another individual or entity.

**40. INTERPRETATION.**  Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**41. SEVERABILITY.**  If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**42. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; by nationally recognized overnight courier, or when sent by electronic mail. Notice to Borrower may also be posted to Borrower's Online Account or sent to Borrower's last known address, or electronic mail address in Lender's records for Borrower. Notice to Lender may be sent to: Ampla, LLC, attention: Anthony Santomo, Founder and CEO, 1239 Broadway, 12th Floor, New York, NY 10001.

**43. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of the Collateral (including without limitation the Receivables). At Lender's request, Borrower shall deliver to Lender: (i) schedules of the Collateral (including without limitation the Receivables); and (ii) such other information regarding the Collateral (including without limitation the Receivables) as Lender shall request. Lender, or any of its agents, shall have the right to call at any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers), at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the

DocuSign Envelope ID: 88E20BA3-B04B-4180-BA75-A0DD50CE5A7A

**GROWTH LINE OF CREDIT AGREEMENT**

books, records, journals, orders, receipts, correspondence that relate to the Collateral (including without limitation the Receivables) or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for the Line of Credit by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing accounts made through such Referring Party's referrals.

**44. CHANGE IN TERMS UPON SUCCEEDING ADVANCE REQUEST ONLY**. Lender may change any of the terms of this Agreement, provided, however, that Lender will notify Borrower of such changes (by posting or otherwise reflecting such change in the Online Account) and such changes shall only become effective as of the immediately succeeding Advance Request.

**45. GOVERNING LAW.** Subject to Section 35 above, our relationship (including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement) is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law), New York law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**46. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any other person who has obligations pursuant to this Agreement, to the extent not prohibited by applicable law, hereby waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: (i) Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement; and (ii) Lender may, but will not be obligated to, sue one or more persons without joining or suing others.

**47. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail or via the Borrower's Online Account.

**48. CONFIDENTIALITY.** Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents for purposes of satisfying the Obligations pursuant to this Agreement.

**49. ENTIRE AGREEMENT.** Any application Borrower signed or otherwise submitted in connection with this Agreement, the accompanying Supplement and the Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Line of Credit and/or Online Account are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**50. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic transmission shall be treated in all respects as original signatures.

**51. CUSTOMER SERVICE CONTACT INFORMATION**. If you have questions or comments about your Online Account, you may contact us by (i) e-mail at accountmanagement@getampla.com, (ii) telephone at (833) 678-7483, or (iii) mail at Ampla, LLC, 1239 Broadway, 12th Floor, New York, NY 10001.

**52. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understood and agreed to be bound by its terms. Each person executing certifies that each person is executing on behalf of the Borrower and/or in the capacity indicated (and if Borrower is a sole proprietorship, in the capacity of the owner of such sole proprietorship) and that such person is authorized to execute this Agreement on behalf of or in the stated relation to Borrower.

<u>Use of Proceeds Certification</u>

As referred to in Section 6, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Line of Credit (including, for the avoidance of doubt, any and all Advances) will be used solely for the following purposes only:

- Purchases of inventory, raw materials, packaging, or other specified goods;
- Manufacturing payments;

GROWTH LINE OF CREDIT AGREEMENT

- Payments to shipping and/or fulfillment partners;
- Purchases of marketing and advertising services; and
- To the extent not included above, other general and administrative costs as determined by Lender in its sole discretion.

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") (the "Authorization") is part of (and incorporated by reference into) the Growth Line of Credit Agreement (the "Agreement"). Borrower should keep this important legal document for Borrower's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.** By executing this Authorization, Borrower authorizes Lender to disburse Advance proceeds (less the amount of any applicable fees) by initiating an ACH credit, wire transfer or similar means to the Designated Checking Account (as such term is defined in the Agreement). This Authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**CONSENT TO DEBIT SCHEDULE AS SET FORTH IN AGREEMENT.** By executing this Authorization, Borrower agrees to, and hereby, authorizes Lender to collect payments required under the terms of Borrower's Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Debit Schedule as set forth in the Agreement. Borrower authorizes Lender to assess multiple ACH debits to pay down Obligations, if necessary pursuant to and consistent with the Agreement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's rights under the Agreement, however, if Borrower fails to keep Borrower's Designated Checking Account in good standing or if there are insufficient funds in such account or if Lender is unable to collect any amounts by ACH debit owed to Lender under the Agreement. If Borrower revokes the authorization, or Lender suspends or terminates Borrower's rights under the Agreement, the Obligations remain outstanding and Lender reserves all rights under the Agreement accordingly.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

| | | | |
|---|---|---|---|
| Routing Number: | 051402372 | Account Number: | 8760683784 |
| Tax ID: | 452548672 | | |
| By: | *(DocuSigned by: 76E5D6AC47BD448...)* (Signature) | | |
| Name: | Erin Burke | | |
| Date: | 9/27/2022 | | |

## Signature Page

I hereby, as a duly authorized agent of Borrower, affirm that I have read and understand the terms and conditions of, consent to, and agree to be bound by, the Growth Line of Credit Agreement, the accompanying Supplement, and the accompanying Authorization Agreement for Direct Deposit (ACH Credits) and Direct Payments (ACH Debits).

Borrower State of Incorporation: OHIO

Borrower Headquarters State: OHIO

Borrower Headquarters Address: 1419 Boardman-Canfield Rd, STE 280, Youngstown, OH 44512

**BORROWER: BURKE DECOR, LLC**

By: _[DocuSigned by: 76E5D6AC47BD448...]_
    (Signature)
Name: Erin Burke
Its: MEMBER
Date: 9/27/2022

**LIMITED GUARANTY.** The guarantor signing below is an owner or partial owner of the Borrower ("Limited Guarantor"). The Limited Guarantor understands and agrees that he or she, in his or her individual and personal capacity, shall be liable, but only liable, for losses and/or damages caused by Borrower's gross negligence, willful misconduct, misrepresentation or fraud. Such Limited Guarantor will benefit by the transactions contemplated under this Agreement, and Lender executes this Agreement based on such Limited Guarantor agreeing to this Limited Guaranty.

By: _[DocuSigned by: 76E5D6AC47BD448...]_
    (Signature)
Name: Erin Burke
Date: 9/27/2022

| | |
|---|---|
| For Lender's Use Only: This Agreement has been received and accepted by Lender. | |
| By: | _[DocuSigned by: Anthony Santomo, BEAE57775DED4DA...]_ (Signature) **Anthony Santomo** |
| Date: | 9/27/2022 |

**[REST OF PAGE LEFT INTENTIONALLY BLANK]**